351 A.2d 95.

STATE *vs.* FRANK L. MARRAPESE, JR.

FEBRUARY 3, 1976.

PRESENT: Paolino, Acting C. J., Joslin and Kelleher, JJ.

KELLEHER, J. In May 1970, the Grand Jury for the Counties of Providence and Bristol returned two indictments against the defendant Frank L. Marrapese, Jr. The first indictment charged Marrapese with conspiring with James R. Harris and Harry L. Gantz to commit larceny. The second indictment charged Marrapese and Gantz with receiving stolen goods. The cases were consolidated for a jury trial in Superior Court. The jury returned guilty verdicts on both indictments. Motions for a new trial were denied and the case is before us on an appeal[1] in which Marrapese claims that the trial justice erred on three different occasions by refusing to pass the case and declare a mistrial. Additionally, Marrapese questions a portion of the jury charge. Turning to the record, we are reminded of Congreve's famous utterance that "Heaven has no rage like love to hatred turned Nor hell a fury like a woman scorned."[2]

The prosecution's star witness was Vivian. She told the jury that Marrapese's nickname was Bobo. Bobo and Vivian were sweethearts, but theirs was an "on and off" romance. In November 1969, Bobo and Vivian had been living together about 2 years. Their togetherness had been punctuated by frequent fights and periodic separations.

---

[1] We note that at trial all the defendants were represented by the same attorney. Marrapese's appellate attorney is not his trial counsel.

[2] Congreve, *The Mourning Bride*, Act III Sc. 8 (1697).

Sometime in October 1969, during one of the couple's spats, Bobo fractured Vivian's arm. At that time Bobo and Vivian were sharing their Warwick apartment with Harris and his wife. Vivian moved out of the apartment and eventually moved in with her brother who lived in the Eagle Park section of Providence. Just prior to November 10, Bobo and Vivian patched up their differences and they celebrated their reunion at a Coventry nightclub where it was agreed that a change of scenery would do both of them a lot of good. Bobo suggested a camper safari to Florida and Vivian thought such an undertaking was a grand idea. The only problem was that Bobo did not own a camper; however, he assured Vivian that Harris and Gantz would supply them with the necessary means of transportation.

Vivian whose testimony forms the basis of this narrative told the jury that at approximately 9 o'clock on the evening of November 10, 1969, Bobo and Harris picked her up at her brother's home. The trio then drove to Gantz's home which is situated in the Smith Hill area of Providence. On the way Harris assured Bobo that he and Gantz should have no difficulty in stealing a camper which was parked on an outside lot of an East Providence automobile agency. A toot of Bobo's horn summoned Gantz to the curbside for a conference. He and Harris took their places in the back seat of Bobo's car where they were given orders to go ahead and pick up the camper. Harris, exuding confidence, told Bobo that the "heist" was bound to be a success since there was only one camper on the East Providence lot. Gantz, more pragmatic than enthusiastic, wanted to know what was in it for him and Bobo offered to reduce some of the "juice" on a loan Gantz owed him. Satisfied with this arrangement, Harris and Gantz left the car. Vivian reported, however, that Harris returned to the car and asked Bobo for $150. Re-

luctantly, he gave Harris the money, warning him not to let the allure of a card game interfere with his mission.

Bobo and Vivian proceeded to a Warwick nightclub for a brief respite, and thereafter they drove to East Providence to see if Harris and Gantz had made the pickup. The camper was still parked in its original location. Bobo proceeded to the Triggs Golf Course in Providence where he parked the car and had a bit of a nap. Vivian woke him up at 11:20 p.m. at which time the sweethearts left to pay a second visit to Gantz's Smith Hill home.

As they pulled up in front of their destination they saw the 1969 motorized camper they had seen earlier in the East Providence parking lot. It was parked in one of a string of garage stalls located in Gantz's back yard. After she and her boyfriend inspected the camper, they both agreed that the new acquisition would afford them a pleasant change and an exhilarating sojourn in Florida's sunny climes. Gantz, however, expressed some concern about the rear portion of the camper which protruded beyond the opening of the stall. He wondered aloud about what would happen if his next door neighbor's son, a Providence Police officer, would cast an inquisitive eye at the camper's protrusion. Bobo agreed that other storage arrangements would have to be made and once again he assured Gantz that the "juice" would be reduced. Since there was nothing further to discuss, the quartet went separate ways. Vivian was driven to her brother's home.

"A couple of days" passed by and Vivian had heard nothing from Bobo. Finally, he answered one of her innumerable telephone calls and told her that everything was off, including the Florida trip and their romance. Vivian, however, not a girl to simply sit by and do nothing about a sudden switch in his plans and affections, took a cab to Bobo's parents' home where a confrontation ensued. This skirmish resulted in her ejection from the

premises. As this chapter of our turbulent romantic saga comes to an end, Vivian was standing in the middle of the street shouting, "car thief, car thief, I am going to turn you in to the police."

Vivian kept her promise. On November 17, she called the Rhode Island State Police and told Detective Vincent Vespia, Jr. where he could find a brand new stolen camper. Vespia placed Gantz's home under surveillance. He saw the camper, which a subsequent check with the East Providence automobile dealer established as the stolen vehicle. A search warrant was issued and the camper, Bobo, Harris and Gantz were all taken into custody.

Bobo made bail and on Thanksgiving Eve paid Vivian a visit. The purpose, however, was business, not social. Apparently unimpressed with Vivian's new found interest in law and order, he assaulted her. The rescue squad was summoned and Vivian was again hospitalized. After her recovery, Bobo and Vivian were reunited. They lived together for a two-week period during which Bobo unsuccessfully attempted to dissuade her from testifying. Apparently, the reservoirs of his persuasive charm had run dry.

At the trial Bobo, Harris and Gantz testified and denied that they had anything to do with the theft of the camper.

In this facet of his appeal, we will consider Bobo's claim that the trial justice erred by refusing to pass the case and declare a mistrial on several occasions. As we noted earlier, the mistrial motions were made while Vivian was being cross-examined.

The first incident occurred when Vivian was being pressed by defense counsel as to why she could remember that the camper was stolen on November 10 and she responded "because it was the day before a holiday." When asked to name the particular holiday, however, Vivian replied that she couldn't. Defense counsel expressed

wonderment as to how she could remember the particular day of the theft and not the holiday it preceded. Vivian defensively responded that she kept track of everything Bobo did and added the comment: "Every time he stole I kept track of it, just in case." Defense counsel moved that the answer be stricken and the case passed.

The second incident occurred later when the cross-examiner began to dwell on those persons who were present at the time of the broken arm episode. Vivian insisted that the hospital records would show that the disturbance occurred sometime around midnight. The defense counsel then asked Vivian, "isn't the real reason why your arm was broken is because Bobo found out you urinated in the soup that he ate * * * [which] you prepared for him." Vivian, indignant at this suggestion, described this statement as a "lie." The identical question was repeated twice and each time it was met with a denial. Vivian was then asked: "You mean Bobo doesn't eat at 12 o'clock at night?" She responded that she didn't know because he was never home. The defendant's attorney continued the query by asking, "[d]idn't you live with him for a couple of years?" Vivian replied that she would not describe their two-year association as "living" because most of the time "he was out stealing." A second motion to strike and pass was made.

At this point the trial justice reminded Vivian of his earlier instructions that she be brief and direct in her answers and not embellishing in her replies. Vivian turned to the trial justice and asked why defense counsel could ask her questions but she couldn't answer back. When the trial justice explained to the witness that defendant's attorney was exercising his "prerogative," Vivian said to the trial justice: "Why don't you ask him [defendant's attorney] about when he called me and tried to have me

take money to go away to Florida." For a third time, a motion to strike and pass the case followed.

Motions to pass a case and declare a mistrial are matters within the discretion of the trial justice. He or she has a "front-row seat" at the trial and is therefore best able to gauge the effect of the improvident remarks heard by a jury. *State* v. *Pailin,* 114 R. I. 725, 729, 339 A.2d 253, 255 (1975). When matters of a harmful nature are improperly brought before a jury, either intentionally or inadvertently, the trial justice, in response to a complaint being made, must assess the potential prejudicial impact of the challenged material. A decision must be made. If the prejudice is inexpiable, the motion to pass should be granted. If the prejudice can be cured, the instructions which follow must be timely and effective. *State* v. *Sherman,* 113 R. I. 77, 82, 317 A.2d 445, 448 (1974). There is no fixed formula to determine whether the prejudicial taint has been removed. Each case must be decided on an *ad hoc* basis and each challenged remark must be viewed in the context in which it appeared and in light of the attendant circumstances. *State* v. *Bowden,* 113 R. I. 649, 654, 324 A.2d 631, 635 (1974). A mistrial will be ordered at the appellate level only if we are convinced that the cautionary instructions were untimely or ineffective, or if the improper material had been so indelibly etched in the jurors' minds that, despite his timely action, the trial justice did not disabuse the jurors' minds of the prejudicial effect. *State* v. *Sfameni,* 115 R. I. 18, 22, 339 A.2d 744 -45 (1975); *State* v. *Costa,* 111 R. I. 602, 609-10, 306 A.2d 36, 40 (1973); *State* v. *Mancini,* 108 R. I. 261, 273-74, 274 A.2d 742, 748-49 (1971).

With these rules as our guide, we look at the record. When Vivian first mentioned the holiday and related it to Bobo's alleged larcenous habits, the trial justice ordered the remarks stricken from the record and admonished the

jurors that Marrapese was on trial only for the November 10 charges, and that Vivian's comment was not part of the case and should be dismissed from their minds. Again, when the witness referred to Bobo's being away from home stealing and to the attorney's purported offer, the trial justice excused the jury, heard arguments and took a brief recess. He returned to the bench and had the stenographer read to him the colloquy that had taken place between Vivian and defendant's counsel. The trial justice expressed some doubt as to whether the jurors heard Vivian's response to his reference to the attorney's prerogative. He then summoned the witness before him. Describing her as emotionally involved with the proceedings and having a tendency to give rapid answers, he told her to give simple, direct answers to questions asked by defense counsel. Additionally, she was warned that if she offered any further derogatory remarks about Bobo or his counsel, she ran the risk of being held in contempt. The jurors returned to the courtroom where they were told by the trial justice to be true to their oath and disregard Vivian's remarks about Bobo's frequent absences from home and the alleged encounter with the attorney. Again, the trial justice at the conclusion of his charge told the jury to consider the case "honestly, fearlessly [and] courageously" and return a verdict in accordance with the facts and the law and to do justice to the state and defendants.

In measuring the effectiveness of the trial justice's instructions, we look to the whole record. After such a review, we are convinced that he took timely and effective action to insure that the jury's verdict rested solely on legal, competent evidence presented to it.

In their testimony, Bobo and Harris buttressed most, if not all of Vivian's story. They both agreed, notwithstanding the spoiled soup, that a reconciliation had taken

place and a camper trip to Florida was in the works. Harris admitted that he gambled and at times lost as much as $100 in a poker game. Gantz, in his appearance on the stand, told the jury that on the evening of November 10, Bobo and Vivian drove onto his property to inspect the brand new unregistered camper that was parked in the short stall.

Vivian insisted that she had checked the time that they had left the parking lot at the golf course by looking at the clock in the car. She said that the car they were using belonged to Bobo's mother. The defense introduced evidence that this vehicle was a 1969 Buick four-door sedan which was not equipped with a clock. However, records from the Buick dealer showed that the father also purchased a 1969 Buick convertible for Bobo's use and it came equipped with a clock. Earlier the father claimed that he did not know what equipment came with the convertible because he said that he never used or "was in" that car.

Gantz contended that he had rented the garage stall near the end of October to a man named Johnson or Jameson and that the camper was immediately placed on his property. Gantz said that this tenant had responded to a "for rent" sign that had been placed in the front window of his second-floor tenement apartment. However, he claimed that he had no idea where his tenant, who apparently enjoyed 20-20 vision, lived or where he could be reached should a catastrophe strike the garage area.

Bobo, upon taking the stand, traced for the jury the history of his involvement with the camper. First, he had heard of the availability and location of the camper from a part-time bartender who was quoting a $1500 asking price. Bobo met Gantz on the night in question and inspected the camper. However, after comparing the low

price with the camper's mint condition and an odometer with no mileage he became angry with the bartender because he suspected he was being offered stolen goods. He claimed that he had told Detective Vespia about his conversation with the bartender. When pressed as to the bartender's identity, Bobo gave his name but announced that he had died some 5 weeks previously. When Detective Vespia returned to the witness stand, he insisted that the first time he heard about the bartender's proposal was when Bobo testified.

Harris told the jury that he and Bobo were as close as brothers. Like Gantz, he too had a memory failure. He had moved to Rhode Island in the fall of 1969 after driving here from Tennessee. At one point in the trial he could not remember the make of his car. Finally, he agreed with the prosecutor that it was a 1968 Cadillac. However, by the time he took the witness stand he couldn't remember what had happened to the Cadillac.

It should be emphasized that early in Vivian's cross-examination an inquiry was made regarding Bobo's motive for breaking her arm. She stated that his actions were prompted by her hiding the keys to the "three * * * cars he stole the night before." When the prosecutor expressed amazement at this response and offered to have it struck from the record, defense counsel rejected the offer and told the trial justice that he did not mind the answer "[b]ecause her credibility is at stake."

This set the stage for a wide sweeping no holds barred attack on the witness's credibility, character and mental stability. The polluted soup episode was brought up many times. Bobo's father alluded to several incidents when Vivian supposedly slashed the roof of Bobo's convertible. Harris was permitted to tell the jury that he thought Vivian was "nuts." This characterization was caused by the later mentioned fact that Vivian had once

threatened to kill Harris, his wife and their child with a rifle.

The jury therefore had sufficient competent evidence to find that Vivian's story was pure fiction, the product of a scorned woman with a mixed-up mind. However, in their efforts to discredit Vivian, the defense presented evidence which did indeed support the tale she told. Based on the record before us we do not hesitate to find that the jury complied with the trial court's mandate to ignore Vivian's outburst and decide the case solely on the evidence properly before it. Putting Vivian's spontaneous utterances to one side, there is ample evidence to support the findings of guilt. Consequently we find no fault with the trial justice's denial of the mistrial motion.

The defendant's counsel lodged only one objection to the final charge. The trial justice, when addressing the law applicable to the receiving stolen goods indictment, explained to the jury the theories of actual and constructive possession as they related to the camper. He told the jury that under the terms of G. L. 1956 (1969 Reenactment) §11-41-2, possession of stolen property is evidence that the possessor knew the property was stolen. However, he added that the possessor could counter this evidence by showing that the contraband was acquired for adequate consideration in the due course of trade.

At the conclusion of the charge defense counsel took objection to the court's failure to instruct the jury on the "possessory right." When the trial justice asked for a repeat of the objection, counsel observed that since the garage stall had been rented the court was required to explain to the jury what the element of "possession" means when the stolen goods are found on rented property. Otherwise, counsel contended, the jury could construe the owner to be in possession of a camper and "I don't think they can make that legal decision on their own."

It is obvious that this objection was lodged solely for the benefit of Gantz. No objection to the charge as it related to the other defendants was made or brought to the trial justice's attention. Moreover, we note that Rule 30 of the Superior Court Rules of Criminal Procedure obligates trial counsel to articulate their objections in such a fashion so as to alert the trial justice of the exact nature of the alleged error — be it one of commission or omission. *State* v. *Amado,* 109 R. I. 53, 58, 280 A.2d 324, 327 (1971). The failure of trial counsel to make a proper objection now precludes Marrapese's appellate counsel from attempting to launch a belated challenge to the sufficiency of the charge. *State* v. *Crescenzo,* 114 R. I. 242, 258, 332 A.2d 421, 430-31 (1975); *State* v. *Murphy,* 113 R. I. 565, 577, 323 A.2d 561, 567 (1974); *State* v. *Carraturo,* 112 R. I. 179, 191, 308 A.2d 828, 834 (1973).

The defendant's appeal is denied and dismissed.

Motion to reargue denied.

Mr. Chief Justice Roberts did not participate. Mr. Justice Doris was present for oral argument but did not participate in the decision.

*Julius C. Michaelson,* Attorney General, *John Austin Murphy,* Special Asst. Attorney General, for plaintiff.

*Bevilacqua & Cicilline,* for defendant.