382 A.2d 801.

STATE *vs.* MILTON C. MASSEY, III.

JANUARY 30, 1978.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

DORIS, J. The defendant, Milton C. Massey, III, was tried before a justice of the Superior Court sitting with a jury on an indictment charging him with two counts of assault with a dangerous weapon (a knife) in violation of G.L. 1956 (1969 Reenactment) §11-5-2. The defendant was found guilty on one count and not guilty on the other. He was sentenced to four years at the Adult Correctional Institutions, two years suspended, with four years probation thereafter. Execution was stayed pending appeal.

The sole issue raised on appeal by defendant is the trial justice's denial of his motion to pass the case.

The error claimed by defendant occurred during the process of jury selection. In questioning the initial panel of prospective jury members, defense counsel learned that potential juror Mosher had been at the scene of the stabbings shortly after they occurred and had remained there briefly to watch the police investigation. Mosher admitted discussing the incident with people at the scene. The following colloquy then took place between defense counsel and Mosher in front of the prospective jury panel and other potential jurors:

"Q   At the time you had these discussions, did you form any opinion as to whether or not a crime was committed and whether or not someone was responsible?

"A   Well, to be honest, yes.

"Q   You did form an opinion?

"A   I said, 'I'll bet it was a Massey.'

"Q   Excuse me?

"A   I'll be honest. I said 'I'll bet it was a Massey.'

"Q   Was this as a result of a conversation you were having at the time you made this remark?

"A   Yes."

Mosher was excused from the panel and defense counsel moved to have the case passed on the ground that the statement made by Mosher was so prejudicial to defendant that he could not receive a fair trial regardless of any instructions given to the jury by the trial justice.

The trial justice initially was of the opinion that the case had to be passed, but he subsequently changed his mind when he was informed by the prosecution that two other members of the Massey family, in addition to defendant, were at the scene of the stabbings. The trial justice then asked the prospective jurors if any of them felt his judgment would be prejudiced by the remark. He did not, however, instruct the jury to disregard the statement. None responded. The trial justice then denied the motion to pass the case.

Defense counsel then requested that each potential juror be questioned individually regarding Mosher's statement on voir dire. The trial justice granted the motion, and several prospective jurors were subsequently excused or challenged.[1] Following the completion of the voir dire,

---

[1]From the record it appears that the jury ultimately selected to hear the evidence consisted of two jurors who were not present when the statement was made and three jurors who were present but testified that they had not heard the statement. The remaining members of the panel admitted on voir dire to having heard the remark but stated that it would not affect their judgment in the case.

defense counsel again moved to pass the case. The motion was denied.

"The determination of whether a questioned statement is harmless or improperly prejudicial is, in the first instance, addressed to the sound discretion of the trial justice." *State v. Sfameni,* 115 R.I. 18, 22, 339 A.2d 742, 744 (1975); *see State v. Peters,* 82 R.I. 292, 296, 107 A.2d 428, 430 (1954). In cases involving tainted statements, the trial justice ought to attempt to cure the taint. If, however, he is unable to free the minds of the jury from the tainted remark, he ought to pass the case. *State v. Sfameni, supra; Lavigne v. Ballantyne,* 66 R.I. 123, 126, 17 A.2d 845, 846 (1941). The question we must decide, therefore, is "whether in the context of the facts in this case, the trial justice exercised proper discretion in refusing to pass the case." *State v. Manfredi,* 118 R.I. 144, 148, 372 A.2d 975, 977 (1977); *State v. Sfameni,* 115 R.I. at 22, 339 A.2d at 745.

This court has held that a defendant is denied a fair trial when evidence of other separate and distinct crimes is erroneously put before the jury. *State v. Manfredi, supra; State v. Costa,* 111 R.I. 602, 306 A.2d 36 (1973). In these cases we have found that the cautionary instructions given by the trial justice were insufficient to free the minds of the jury from the prejudice which results when jurors learn that the individual on trial before them has committed other unlawful acts. No different result ought to be reached when the information comes to the attention of the jury not by way of testmony but through a statement by a juror on voir dire. *See Commonwealth v. Harkins,* 459 Pa. 196, 328 A.2d 156 (1974).

This case differs somewhat from our previous cases and *Harkins,* in that Mosher made no direct statement implicating defendant in a separate and distinct crime. However, in our opinion, no less harm resulted to defendant. The basic underpinnings of the rule prohibiting the use of evidence of other crimes against a defendant include the undue burden

imposed upon the defendant of defending himself against another charge and the introduction of prejudice and confusion into the minds of the jury. *State* v. *Beaulieu*, 116 R.I. 575, 579-80, 359 A.2d 689, 691 (1976). The defendant here was placed in a position of having to defend himself against not one specific additional charge but rather the inescapable implication that had been left with the jurors that his family was always in trouble with the law. As the trial justice himself noted, the statement "indicates a little bit of preknowledge about the propensities of the Massey family to get into the clutches of the law." Such statements regarding general reputation are often more difficult to refute than remarks concerning a single illegal act because of their ill-defined and vague nature. The significance of the fact that Mosher was at the scene of two violent acts *for only several minutes* and yet concluded that "it must have been a Massey" who committed the acts certainly was not missed by the other prospective jurors.

Evidence of a defendant's bad character, if allowed to get to the jury through a juror during deliberations, has been assumed to be prejudicial, and the burden has been placed on the government to rebut the presumption by demonstrating harmlessnes. *See United States* v. *Howard*, 506 F.2d 865 (5th Cir. 1975). Such evidence regarding a defendant's reputation, legally inadmissible in this case. ought not to be allowed to reach the jury by other methods when it would not be allowed to reach them from the witness stand.

As has been stated, the trial justice initially decided to grant the motion to pass and then changed his position only after being told by the prosecution that evidence would be presented linking three members of the Massey family to the scene of the stabbings. The evidence presented at trial, however, clearly demonstrated that only one Massey, defendant herein, was at the scene at the time of the stabbings. The other two members of the family had left the scene of the incident. The trial justice had apparently decid-

ed that with three Masseys at the scene, the jury did not have to focus on defendant exclusively as the guilty party. The impact of the Mosher statement was not simply an indictment of one unnamed Massey as the person responsible for these violent acts, it was also a remark which in effect told the other potential jurors that the Massey family was always in serious trouble. This statement could not help but prejudice these potential jurors against the family in general and defendant in particular, as he was the only one standing before them accused of committing these crimes.

Nor are we convinced that the methods adopted by the trial justice were sufficient to free the minds of the jurors from the prejudicial effect of the statement. The cautionary instruction given by the trial justice did not inform the potential jurors that they were not to consider the statement. He instructed them that defendant was entitled to a fair trial and asked if any of them would feel prejudiced by the remark. None responded. Yet on voir dire one potential juror was excused by the trial justice for the very reason that he admitted the statement would prejudice his decision.

Further, we cannot say that the individual voir dire of the potential jurors demonstrated a lack of prejudice. Statements coming from a nontestimonial source linking a defendant to a particular crime and inferring the commission of others are most difficult to disregard. The United States Supreme Court has recognized that in certain circumstances when prejudicial information has been allowed to reach the jury, affirmative statements by jurors that such information would not affect their decision is not enough to allow the trial to proceed, and a mistrial should be declared. *Marshall* v. *United States*, 360 U.S. 310, 79 S. Ct. 1171, 3 L. Ed. 2d 1250 (1959). We note that during the initial questioning of the prospective jury panel, after potential juror Mosher had revealed that he arrived at the scene shortly after the stabbings occurred, Mosher himself stated to the trial justice that his judgment would not be influ-

enced in the case by what he had heard and witnessed at the scene. The effectiveness and reliability of individual questioning, given the prejudicial nature of the statement, must be viewed as doubtful at best.

Further, we cannot agree with the state's argument that the error was harmless. Inconsistent verdicts arrived at by a jury which heard equal evidence of both stabbings by the same witnesses do not allow us to say that the error was not harmful to defendant. Although we will never know with any degree of certainty the rationale of the jury's verdicts, we cannot ignore the possibility that a compromise verdict was reached based upon the tainted statement. Because we cannot say that the procedures adopted by the trial justice were sufficient to cure the taint, defendant was denied his right to trial by an impartial jury. The burden therefore is on the state to show that the error was harmless beyond a reasonable doubt. *Chapman* v. *California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The state has failed to meet that burden.

This court has noted that there is no fixed formula by which we can determine whether a particular statement is prejudicial. *State* v. *Manfredi*, 118 R.I. 144, 372 A.2d 975 (1977). Every case must be decided on its own facts. The one before us is certainly not free of doubt. Under the particular facts before us, involving a prejudicial statement heard by most potential jurors during the early stages of empaneling a jury, we hold that the trial justice abused his discretion in refusing to pass the case. "Where, as here, doubt exists as to the propriety of the trial justice's refusal to pass the case, such doubt is to be resolved in the defendant's favor." *State* v. *Manfredi*, 118 R.I. at 149, 372 A.2d at 977.

The defendant's appeal is sustained, the judgment of conviction is vacated, and the case is remanded to the Superior Court for a new trial.

Mr. Justice Paolino participated in the decision but retired prior to its announcement.

MR. JUSTICE KELLEHER, with whom MR. JUSTICE JOSLIN joins, dissenting. As this court has attempted to balance an accused's right to a fair trial with the pragmatic realization that there is no guarantee of an error-free trial, certain well-estblished principles have been enunciated. They are: (1) in dealing with comments or conduct that is allegedly prejudicial to an accused, the trial justice has broad discretion; (2) a case must be passed when the extraneous revelation is so flagrantly improper that the trial justice believes that its content was so indelibly etched upon the minds of the jurors that prompt and appropriate instructions could not eradicate its prejudicial effect; and (3) if the trial justice thinks that the prejudicial stain can be removed, the record must be examined to see if the accused's right to a fair trial has been preserved. With these principles in mind, we turn to the record to determine what actually occurred before and during the selection process of the jury that ultimately heard the evidence which was presented by the prosecution and the defense.

Before the actual selection of the jury began, the trial justice addressed the panel of prospective jurors and informed them that the case which was about to be tried concerned an indictment which charged that Massey on November 23, 1973 committed two assaults with a dangerous weapon — a knife. He told the panel that the indictment is simply a formal accusation, and Massey was to be presumed innocent of the charges lodged against him. This presumption, he continued, would remain with Massey until such time as the jury in its collective wisdom believed that the state had proved its case. Following these remarks, the clerk reached into the jury-selection barrel and drew from it the names of fourteen members of the panel. The fourteen took their places in the jury box, and voir dire began.

The prosecutor then introduced himself and told the fourteen selectees that the state would present evidence concerning two stabbings which occurred in Newport on Cowie Street, which is a street that in part runs through a portion of the city's Tonomy Hill Housing Project. He then asked if any of the fourteen was familiar with the area or might have heard about the stabbings. At this point Mr. Mosher spoke up and told the prosecutor that on the day in question he had come upon the stabbing scene shortly after the assaults had occurred. Mosher at that time was on the way to visit his mother, who lived in the neighborhood. Mosher observed the police for a few minutes as they went about their investigation and, after conversing with his fellow spectators, remarked: "I bet it was a Massey." When the trial justice asked Mosher if his on-the-scene contact would influence his judgment as a juror, he replied: "No, I don't think so." Later, when defense counsel inquired whether the selectee, as he stood on Cowie Street, had reached an opinion as to who did the stabbing, Mosher replied in the affirmative, saying that at the time he thought it was "a Massey." Mosher was then excused from any further service on the panel.

From this candid report by Mosher, the majority has now set aside a criminal conviction, apparently on the basis that his reference to the Massey family generated such an enormous and immediate feeling of prejudice against defendant Milton Massey that it was not reasonably possible that the trial justice, despite a heroic effort on his part, could neutralize Mosher's report by an individual questioning of the panel of potential jurors as well as repeated appropriate instructions. I cannot accept the view that Mosher's on-the-scene conclusion which was reached without benefit of any personal knowledge of what had transpired, might have so prejudiced defendant that a guilty verdict was almost a foregone conclusion once Mosher had reported where he was and what he said on the day of the stabbings.

A study of the record makes clear that there was nothing so flagrantly improper about Mosher's report that the jury could not appraise the evidence presented in an objective and dispassionate manner. I believe that there was no reasonable possibility that his reference to the Massey family could have distracted the jurors' attention from or influenced their decision on the ultimate issue of whether Milton Massey was the one who, in a matter of seconds, had stabbed Ronald Walls and James Clover. *State* v. *Pailin*, 114 R.I. 725, 730, 339 A.2d 253, 256 (1975).

This is not a case where evidence of other separate and distinct crimes of the defendant had been put before the jury. *State* v. *Costa*, 111 R.I. 602, 306 A.2d 36 (1973); *Marshall* v. *United States*, 360 U.S. 310, 79 S. Ct. 1171, 3 L. Ed. 2d 1250 (1959). Mosher, in response to inquiries of counsel, gave a frank and honest report as to what he said to his fellow spectators as they watched the Newport police going about their business on Cowie Street. In any event, I do not believe that the majority can rely on *Marshall* for the proposition that a mistrial should be declared whenever prejudicial information is placed before the jury. *Marshall* reversed a federal narcotics conviction because two newspaper articles, detailing the defendant's previous drug convictions, had somehow come to the attention of a substantial number of jurors. The Court specifically stated that review was undertaken pursuant to the Court's "supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts * * * ." *Marshall* v. *United States*, 360 U.S. at 313, 79 S. Ct. at 1173, 3 L. Ed. 2d at 1252. Of this statement the Court would later say:

> "In the face of so clear a statement, it cannot be maintained that *Marshall* was a constitutional ruling now applicable, through the Fourteenth Amendment, to the States. * * * We cannot agree that *Marshall* has any application beyond the federal courts." *Murphy* v.

*Florida*, 421 U.S. 794, 798, 95 S. Ct. 2031, 2035, 44 L. Ed. 2d 589, 593 (1975).

The Court in *Marshall* did say that the trial judge is vested with a "large" measure of discretion in disposing of contentions that an accused's right to a fair trial has been prejudiced, and it also stressed that there is no hard and fast rule for determining prejudice, as each case must be resolved on its own peculair facts.

The majority's reliance upon *United States* v. *Howard*, 506 F. 2d 865 (5th Cir. 1975), for the proposition that evidence of a defendant's bad character is presumptively prejudicial is subject to dispute. In *Howard* one of the jurors told the rest of the jury that Howard had had previous encounters with the law, and apparently the trial justice, upon being apprised of this statement, took no steps to correct the situation. However, that presumption may well be limited to situations where third persons have approached jurors and made statements to them in an effort to affect the jury's verdict. *Remmer* v. *United States*, 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954); *Richardson* v. *United States*, 360 F.2d 366 (5th Cir. 1966). In any case, subsequent Supreme Court decisions have specifically held that juror exposure to information about a defendant's prior convictions or to news accounts of the crime with which he is charged do not alone presumptively deprive the defendant of due process. *Murphy* v. *Florida*, 421 U.S. at 799, 95 S. Ct. at 2036, 44 L. Ed. 2d at 594; *Nebraska Press Association* v. *Stuart*, 427 U.S. 539, 565, 96 S. Ct. 2791, 2805, 49 L. Ed. 2d 683, 701 (1976).

Here we are not concerned with a surreptitious supplying to the jurors of facts which have not been tested by the trial process. Mr. Mosher, once he was aware of what was about to be tried, remembered the events of November 23, 1973 and told the trial justice and counsel in simple, direct terms what he did and what he believed on that particular day.

What we must decide is whether the measures taken by the trial justice were sufficient to disabuse the jury's mind of the prejudicial effect of the objectionable evidence. After the motion to pass the case was denied, the trial justice assembled the entire panel of prospective jurors in the courtroom, where they were placed under oath. The trial justice then asked if any of them would be influenced or prejudiced against defendant as a result of Mosher's remark. He also stressed that every litigant is entitled to a fair and impartial trial. Defense counsel then requested, and the trial court ruled, that voir dire take place on an individual, *i.e.*, separate, basis. Each member of the panel from which the jury would be selected was brought into the courtroom for one-to-one questioning by the court and counsel. This proceeding, which focused almost exclusively on the Mosher remark, lasted 2 days and encompasses some 142 pages of transcript. A total of 23 potential jurors were examined before a panel of fourteen (twelve plus two alternates) was agreed upon.

After the defense had announced that the fourteen selectees were "satisfactory to the defendant," it renewed its motion to pass the case. In denying this motion, the trial justice declared that he had spent the last day and a half in removing whatever taint resulted from Mosher's remarks. He then went on to say: "I'm firmly convinced that this young man is entitled to a fair trial." While the quote may seem to be a legal non sequitur, the trial justice's slip of the tongue makes it obvious what was on his mind. He was firmly convinced, after conducting an extensive voir dire and continually reminding Mosher's former colleagues of their obligations as jurors, that Milton Massey's fate would be decided solely on the evidence adduced at the forthcoming trial. I share the trial justice's belief.

Four of the fourteen jurors who actually sat and listened to the evidence never heard Mosher's remarks. Two of the four testified that although they were present when Mosher

was being questioned, they did not hear what he had said. The other two could not have heard the remarks because they were not present on the first day of the voir dire, Thursday, April 17, 1975. They first appeared in Newport Superior Court on the following day, Friday, April 18, in response to a summons which had been issued late Thursday afternoon, when it became evident that the peremptory challenges[1] and excusals for cause might dry up the pool of potential jurors.

Two of the jurors who heard Mosher's remarks observed that they did not consider them as being aimed at defendant because there are a lot of Masseys living in the Newport area. Others classified the remarks as "hearsay" or "purely conjecture." Another juror had expressed doubt as to whom Mosher was referring when he mentioned the name Massey. She did not know if Mosher was speaking of the "victim" or of the "accused." Several others, when asked about their reactions upon hearing Mosher's answers, responded with such expressions as "very ignorant on his part. * * * [H]e should have disqualified himself"; "doesn't mean very much to me"; "[m]y impression is that he [Mosher] is not on very good terms with the Masseys * * * what Mr. Mosher thinks of him  * * * will not influence my decision"; "I thought he was just repeating a conversation * * *  something he heard * * * ." The last juror to be impaneled, having survived the excusals for cause and the premptories, reported: "No, I

---

[1]A person who is convicted of committing an assault with a dangerous weapon can be imprisoned for a period up to 10 years. Rule 24(b) of the Superior Court Rules of Criminal Procedure provides that each side in cases where the crime is punishable by death or imprisonment of more than a year is entitled to six peremptory challenges and an additional peremptory challenge if the panel is to be composed of 14 members, and two additional peremptories if the panel is to be composed of 16 — the maximum number of members allowed by the rules. The record here indicates that four of the prospective jurors were excused for cause and the services of five other selectees were no longer required because the state exercised its peremptory right in one instance and the defense exercised its right in four instances.

couldn't hear well. He was facing this way. I heard something, I heard Massey, but that's all I heard."

I am convinced that Mosher's reports could not have influenced the jury's decision on the ultimate issue of Massey's guilt or innocence. Four of the jurors did not hear the remarks, and two who did were totally unaware of the context in which Massey's name was used, and the remaining jurors thought little or nothing of either the remark or the declarant.

In measuring the effectiveness of a trial justice's efforts to eradicate prejudice, we must look to the whole record. *State* v. *Marrapese,* 116 R.I. 1, 351 A.2d 95 (1976). The defense has seen fit to supply us with a truncated record, which includes only a partial transcript of the evidence and a transcript of the trial justice's remarks as he denied the motion for new trial. I assume that the record presented will buttress Massey's claim of prejudice because it will supposedly show the flimsy evidence upon which the guilty verdict is based. Despite its omissions, the truncated record is most informative. The partial transcript contains the testimony of three eyewitnesses to the stabbings: Willie Dubose; Glover's wife, Mildred; and Kathy, a 12-year-old girl, who was 10 at the time of the assault. The denial of the new trial motion referred to Walls's testimony and the medical treatment received by both Walls and Glover.

There is no question that November 23, 1973 was Ronnie Walls's birthday and that the birthday celebration came to a shocking and sudden end shortly after 4 p.m. when Ronnie and Jimmy were stabbed and their blood began to spatter on the Cowie Street roadway.

Willie Dubose, who was Ronnie's girl friend, lives across the street from the Glovers. Her apartment bears a "15 Cowie Street" address. She testified that about 2 p.m. on November 23, Ronnie, Jimmy and Massey visited her home, where they each had a beer and then decided to take advantage of Massey's mechanical know-how by going for a test

ride in Ronnie's car so that Massey could listen to the engine's knock and then render appropriate remedial advice. The trio returned from the test ride at about 4 p.m. This time they were accompanied by two of the Massey brothers and another man whose identity cannot be determined from this record. Ronnie parked his car along the curbing in front of 10-12 Cowie Street. Willie, who had heard the noisy engine coming down the street, looked out her open front door, through the glass portion of the storm door, and as her gaze went from left to right she could see Ronnie's "G.T.X.," and a Chevrolet, and Masey's car parked in that order along the further curb. Ronnie alighted from the driver's side of his car and, as he stood in the street, Massey's two brothers stood beside him. Willie told the jury that she saw Massey go over to the trunk of his car and then return to Ronnie's car with a knife in his hand. After saying something like, "Okay, M.F., what do you want to do now?" he stabbed Ronnie in the chest. Willie reported that after Ronnie fell to the ground, Jimmy came out onto the street, and he was stabbed in the back by Massey. According to Willie, Massey then put the knife back in the trunk of his car and subsequently joined his brothers, who were waiting for him up the street, and they left the area.

Jimmy Glover could not testify at the trial because at that time he was on active duty with the United States Marine Corps on the island of Okinawa. However, his wife, Mildred, told the jury that she was sitting at home in her kitchen when Ronnie drove up in his car with four passengers. Her husband came in the house and then returned to the street. Mildred, like Willie, then went over to the front door. As she looked out into the street, she heard Massey and Ronnie exchanging "a few chosen words." She saw Massey strike Walls on the left side of the chest but thought he was delivering a punch until he threw back his hand, at which time she saw the knife. She also watched as Massey stabbed her husband in the back.

Kathy, the 10-year-old, was playing ball with a friend in front of 12 Cowie Street about 10 to 15 feet away from where six "guys" got out of the car. She knew "Jimmy Glover and Ronald Walls" and said "Walls and another guy" were arguing. The other guy, she said, was wearing a pink-striped shirt and brown pants. According to Kathy, the guy in the pink-striped shirt went to a car, came back with a knife, and stabbed Walls. When Jimmy said, "What did you do that for?" Kathy reported that the knife wielder turned around and stabbed Jimmy in the back. Kathy said she saw Mrs. Glover standing in the doorway, and when she looked aross the street, she also saw Willie standing at her door.

In denying the motion for new trial, the trial justice, in referring to Ronnie's testimony, quoted a portion in which Ronnie said: " 'I was talking to the defendant's brother. I was getting ready to go into the house myself. The defendant shoved me, then grabbed me on the shoulder, he hit me. The next thing, I found myself falling. He hit the left chest area. I didn't see the brothers at this time.' " Ronnie then lost consciousness, and when he awoke, he was a patient in Newport Hospital's intensive care ward. Further on in his decision the trial justice pointed out that after defense counsel had sought to show an inconsistency between Ronnie's in-court testimony and a statement he had given the police, the victim in his redirect testimony explained: " 'No one else touched my body. He, the defendant, grabbed me by the shoulder and shoved me. I told him I didn't want to fight. That's when I was hit and felt the pain, sharp pain. Then I started to collapse.' "

The physician who treated Ronnie testified that the knife blade had pierced his patient's heart. He also reported that Ronnie responded to treatment within an hour after his arrival at the hospital, whereas if he had been in an alcoholic stupor, the doctor said, the reaction time would have been some 12 to 14 hours later.

I have great confidence in the intelligence and integrity of those citizens in our community who put aside their everyday duties to come to the courthouse to serve a stint on the jury. I have no doubt that when the jurors[2] in this case told the trial justice what he or she thought as Mr. Mosher described his experiences on Cowie Street, they were telling the truth. In view of the evidence to which I have just alluded, clearly the guilty verdict returned against Massey represents a conscientious response by the jury to the testimony presented in the courtroom. While the defense tried to show that a protruding exterior partition made Willie's seeing what she said she saw as she looked out on the roadway an impossibility, no one has disputed young Kathy's description of what she saw once those six "guys" alighted from Ronnie's car. There is no question that when Massey took the test ride in Ronnie's car, he was wearing a pink-striped shirt and brown pants.

In reviewing the record, I am reminded of the fact that last fall millions of television viewers watched baseball's World Series and the playoff games that determined the championship of the American and National Leagues. Those of us who watched were constantly reminded by the commentators about the "judgment calls" made by the umpires as they called a player "out" at home or "safe" at first base. Today a substantial number of professional football devotees, particularly those who live in New England and Florida, still recall with some degree of shock and disbelief the December 18, 1977 "judgment call" made by the referee who ruled that the loose ball which was pounced upon by the New England Patriots as they made a goal-line stand

---

[2]While an examination of the record presented to us informs us who were the 14 persons who heard the evidence presented at trial, there is no indication in the transcript as to the identity of the 12 persons who actually returned verdicts in which they found Massey guilty of assaulting Ronald Walls and not guilty of assaulting James Glover. This oversight presents no problem because of the positive actions taken by the trial justice and the unanimous sentiments expressed by the 10 who heard Mosher's remarks that these remarks would not influence their ultimate decision.

against the Baltimore Colts was not a fumble when the television cameras gave substantial evidence to the contrary. Those calls, we were told, would remain unchanged even though the instant replay device might reveal that umpires and referees may not always be infallible.

Here, the trial justice, in refusing to pass this case, made a "judgment call," which, of course, can be reversed by this court notwithstanding our lack of an instant replay device and in the case at bar will be reversed on a partial transcript. We have said that the trial justice, because he is a "front-row" spectator, is the one best able to gauge the effect of any improvident remarks made before a jury. *State v. Marrapese,* 116 R.I. 1, 351 A.2d 95 (1976). In denying the new trial motion, the trial justice remarked that he was "astounded" when the foreman announced the not guilty verdict on the Glover stabbing count. The trial justice's astonishment was well-founded, but the verdict is further proof of the jury's determination that Massey's fate would be decided strictly on the evidence presented at trial. The fact that Jimmy Glover was not present in court to testify to the events surrounding his assault had to be the crucial factor which prompted the not guilty verdict. In the face of the overwhelming evidence indicating Massey's involvement with both of the November 23, 1973 stabbings, it is quite apparent that Massey was the beneficiary, rather than the victim, of Mosher's fortuitous comments. Thus, I vote to uphold the trial justice's "judgment call" and deny Massey's appeal.

*Julius C. Michaelson,* Attorney General, *Alfred French Goldstein,* Special Assistant Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Barbara Hurst,* Assistant Public Defender, for defendant.