**STATE**

v.

**Christopher F. CORREIA.**

**No. 96–528–C.A.**

Supreme Court of Rhode Island.

March 17, 1998.

Andrea J. Mendes, Aaron L. Weisman, Providence, for Plaintiff.

Catherine A. Gibran, Paula Rosin, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG and FLANDERS, JJ.

## OPINION

FLANDERS, Justice.

Three ingredients comprise the factual grist for the appeal of the defendant, Christopher F. Correia (Correia), from his robbery-related convictions: (1) a police officer's trial testimony about Correia's alleged refusal to cooperate with the investigating authorities during his custodial interrogation, (2) a trial justice's consciousness-of-guilt jury instruction based upon Correia's alleged concealment of evidence and his flight from the crime scene, and (3) a magistrate's issuance of a search warrant for Correia's apartment that resulted in the seizure of incriminating evidence. After threshing over the facts and law presented by each of these judicial millings, we conclude that they are not so legally unpalatable as to warrant reversal. Hence we reject Correia's appeal, affirm his convictions, and uphold the trial justice's challenged rulings.

**Facts and Travel**

A Superior Court jury returned guilty verdicts against Correia on all four criminal charges lodged against him.[1] The trial justice then sentenced him to sixty years with fifty years to serve (plus ten years suspended and ten years probation) on each of the first three counts and to five years on the fourth count (to be served concurrently).

The charges all arose out of a February 19, 1994 housebreak in North Providence. An elderly couple, Kathleen and Albert Peloquin, were asleep in their beds when a burglar broke into their North Providence home at approximately three-thirty in the morning. According to the Peloquins, this unwelcome visitor was wearing a gray sweatshirt and a ski mask that hid most of his face from view. Hovering in the dark at the foot of Mrs. Peloquin's bed, the interloper carried a flashlight in one hand and a long cane with a hook on the end of it in the other. He was demanding money from her when he heard another person stirring in a different part of the house. Before dashing away to confront this other individual, the encroacher hurriedly scooped a pair of earrings from a drawer in Mrs. Peloquin's bedroom bureau and then proceeded down the hallway.

Mr. Peloquin was eighty-one when this incident occurred. He had been awakened by a loud noise coming from his wife's bedroom. While Mr. Peloquin was still calling out to her, thinking that she might have fallen, the intruder entered his bedroom and stood over him as he lay in his bed. Brandishing his cane and flashlight, the housebreaker demanded to know, "Where's the money? I want the money." After Mr. Pel-

---

1. The criminal charges, in four separate counts, were as follows: count 1, burglary; count 2, first-degree robbery; count 3, first-degree rob-

bery; and count 4, assault on a person over the age of sixty.

oquin replied that he did not have any money, the assailant lashed out at him with his cane. Mr. Peloquin raised his arm to shield himself from the blow, so that the cane struck him between his elbow and his wrist. Thinking that he had thereby dispatched Mr. Peloquin, the masked man turned and began to ransack some nearby bureau drawers. But Mr. Peloquin was not yet vanquished. He seized a can of mace that he always kept underneath his pillow, rose from his bed, and advanced upon the rummaging robber from his blind side. Waiting until he could see the whites of his eyes, he fired away, releasing a torrent of pungent spray into the holes of his attacker's ski mask. Jolted by this peppery eyewash, the maced malefactor immediately began to bound for the egress—but not before the redoubtable Mr. Peloquin could add his own personal lagniappe to the bouncing bandit's sendoff by bopping him once more for good measure with the spray can itself. Thrashed and throbbing, the thumped thief flew through the living room, out the front door, over the freshly fallen snow, across the street, and through the woods toward the apartment complex that was located directly opposite from the Peloquins' home. Although he thereby escaped Mr. Peloquin's wrath, no sanctuary from the law awaited him there.

Wondering who that masked man was and wanting to thank him with a police escort for his nasty nocturnal visit, the Peloquins summoned the local constabulary, who responded by immediately coming to their home and obtaining a description of the culprit. Following the fresh trail blazed by the peppered poacher, the police eventually found their way to Correia's apartment. After twenty minutes of knocking at the door and calling on the telephone, the police finally gained entrance after one of the occupants, Daniel Crowley (Crowley), opened the door. The officer who first entered Correia's apartment immediately smelled pepper spray. Correia was there, and the police took him into custody. When they later brought him to be viewed by the Peloquins, Mr. Peloquin identified Correia as the man who had shoveled his car out of the snow two days earlier. He also indicated to the police that Correia had the same body build as the intruder.

While he was in police custody and after the police read him his rights, Correia told a police detective that he was indeed the person who had shoveled snow for Mr. Peloquin a few days earlier, but he claimed that he and Crowley had stayed in Correia's apartment throughout this particular evening and early morning. When the police pressed him for further details, Correia suddenly decided to stop talking and refused to say anything further.

Meanwhile Correia's roommate, Crowley, offered police a different version of events. According to Crowley, Correia left the apartment at about 3:30 a.m., and returned at about four o'clock, appearing very nervous. Crowley recounted that when the police knocked on the front door, Correia apparently despaired, exclaiming, "I'm busted," before hiding a cane underneath the entertainment center in their living room. The police sought and obtained a search warrant for Correia's apartment, specifying the cane and the clothing allegedly worn by the intruder as items to be seized. Although they could not locate the cane, they did find clothing in Correia's bedroom that included sweatpants and a sweatshirt that were later identified as the clothing worn by Correia on the night of the robbery. A police laboratory found traces of the pepper spray used by Mr. Peloquin on the clothing seized from Correia's apartment.

### Analysis

### I

### The Mistrial Denial

■ On appeal Correia first claims that the trial court erred in denying his motion to pass the case because of an allegedly improper comment made by a testifying policeman about Correia's decision not to answer further police questions after he had initially agreed to waive his rights and had begun to respond to their queries. We first observe that this is not a case in which a defendant immediately decided to remain silent after having been advised of his *Miranda* rights. On the contrary, after having been advised of his right to remain silent and of his other *Miranda* rights, defendant began to answer

the police officers' interrogatories about the incident they were investigating. For instance Correia told the police that he was the person who had shoveled snow for the Peloquins some two days before the robbery. However, after claiming that he had remained in his apartment all evening, defendant apparently decided he should stop talking to the police, whereupon he indicated that he did not want to cooperate with them any further.

At trial the interrogating police officer was asked whether Correia had stated anything further to him after admitting to his earlier encounter with Mr. Peloquin. The officer responded, "The conversation terminated. He didn't want to cooperate." Correia's attorney immediately moved to pass the case because he claimed the officer had improperly commented on defendant's constitutional right to remain silent. Although the trial justice ruled that there was no reason to pass the case, she did give two separate cautionary instructions to the jurors telling them that Correia had a right to remain silent and that they could not draw any adverse inferences from his doing so.

■ We conclude that the trial justice did not err in refusing to pass the case. Although a defendant's post-arrest silence may not generally be used against him or her at trial, *see Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the *Doyle* rule is inapplicable when, as here, a defendant waives his or her *Miranda* rights and decides to speak to the police after having been advised of his or her right to remain silent. *See State v. Rossier,* 672 A.2d 455, 457 (R.I. 1996) (holding no violation of the defendant's right to remain silent when the defendant made voluntary statements to the police after a knowing waiver of such rights); *see also Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In such a situation, police witnesses at trial are allowed to relate to the jury their observations concerning a defendant's decision to stop talking with the police after initially having done so. When as here a defendant initially waives his or her right to remain silent but later invokes that right by refusing to answer further questions, it is not improper for the prosecu-

tor or the police witness to explain how or why the interview concluded. *See United States v. Harris,* 956 F.2d 177, 181 (8th Cir.1992) (prosecutor may note that, after making incriminating statements, the defendant concluded the interview); *Rowan v. Owens,* 752 F.2d 1186, 1190 (7th Cir.1984) (prosecutor may note without undue emphasis that the defendant had initially given statements but had ended interrogation); *United States v. Williams,* 556 F.2d 65, 67 (D.C.Cir. 1977) (recounting witness may conclude account of interview in natural fashion by indicating that the defendant chose to stop answering questions); *but cf. United States v. Goldman,* 563 F.2d 501, 504 (1st Cir.1977) (noting that *Miranda* allows the defendant to invoke the right to remain silent at any time " 'prior to *or during questioning* ' " but finding no error because defendant voluntarily continued to make statements after having refused to respond to certain police inquiries).

Moreover, even if the police officer's testimony commenting on Correia's alleged lack of cooperation had been improper, the trial justice's instructions to the jury were apt to dispel any prejudice resulting from such remarks. Thus we are not "convinced that the cautionary instructions were untimely or ineffective" or that "the trial justice did not disabuse the jurors' minds of [any alleged] prejudicial effect." *State v. Marrapese,* 116 R.I. 1, 7, 351 A.2d 95, 98 (1976). In sum we hold that the trial justice correctly refused to pass the case because of the testifying policeman's comment about Correia's post-waiver decision to cease responding to further police questioning about his alleged involvement in the robbery.

**II**

### The Flight and Evidence–Concealment Instruction

■ Correia next contends that the trial justice's consciousness-of-guilt instruction was improper because Correia's actions upon returning to his apartment at four in the morning did not in and of themselves constitute flight or evidence concealment. Flight-from-the-crime-scene evidence can be consid-

ered by a jury as circumstantial evidence of a defendant's guilt. *See State v. Reyes*, 705 A.2d 1375 (R.I. 1998). A jury instruction on this subject is warranted if the jury can reasonably infer from a defendant's behavior that his or her actions amounted to flight from the crime scene, that the defendant's flight suggests that the accused was conscious of his or her guilt, that the guilt related to the crime at issue, and that the accused's consciousness of guilt concerning the charged crime is some evidence of his or her actual guilt of that crime. *See State v. Cooke*, 479 A.2d 727, 732–33 (R.I.1984) (adopting the four-pronged test set forth in *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977), for determining the relevancy of flight evidence).

■ From the totality of the evidence introduced at this trial, we conclude that the trial justice properly instructed the jury on consciousness of guilt based upon Correia's actions in fleeing from the Peloquins' home, his initial attempts to elude and/or to evade the police investigation, and his efforts in his apartment to conceal evidence of his connection to the crime. The evidence adduced at trial suggested that after refusing to answer the telephone or the doorbell for twenty minutes, defendant looked out of a peephole in his door and, espying the police, exclaimed "I'm busted." He also had been pacing back and forth in and around his apartment, had removed his clothing, and, according to Crowley, hid the cane he had been carrying underneath the entertainment center. A reasonable jury could infer consciousness of guilt from such evidence. On the basis of these facts and the other indicia of flight and evidence concealment in this record, we hold that the trial justice properly instructed the jury on such matters.

## III

### Sufficiency of the Evidentiary Support for the Search Warrant

Finally, Correia claims that the trial justice improperly denied his motion to suppress the clothing evidence seized from his apartment because of a lack of probable cause to issue a search warrant for his apartment.

Both article 1, section 6 of our Rhode Island Constitution and Rule 41(c) of the Superior Court Rules of Criminal Procedure require that issuance of a warrant empowering government agents to search a person's home for evidence of a crime be predicated upon a showing of probable cause to believe that evidence relevant to the commission of a crime will be found at the place to be searched. *See generally State v. Jeremiah*, 696 A.2d 1220 (R.I.1997) (surveying historical origins of warrant requirements). Whether probable cause exists is a "commonsense, practical" question requiring examination of the "totality-of-the-circumstances" appearing from the warrant application materials. *Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527, 543–44 (1983).

In revisiting this area of the law, we are reminded of the Supreme Court's classic probable cause definition in *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327, 332 (1959):

> " 'In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar v. United States*, [338 U.S. 160] 175 [69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949)]. Probable cause exists where 'the facts and circumstances within [the issuing magistrate's] knowledge and of which [he or she] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the believe that' an offense has been or is being committed. *Carroll v. United States*, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)]."

When assaying the propriety of a search warrant, we review de novo the Superior Court's probable cause determination, *see State v. Rios*, 702 A.2d 889 (R.I.1997), although we, like the trial justice, should give great deference to the issuing magistrate's determination if it appears that he or she had a substantial basis from which to discern probable cause. *See Gates*, 462 U.S. at 236,

103 S.Ct. at 2331, 76 L.Ed.2d at 547; *State v. King,* 693 A.2d 658, 661 (R.I.1997); *cf. Ornelas v. United States,* 517 U.S. 690, 698–700, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996) (appellate courts should apply de novo review to stop-and-frisk and warrantless searches).

Here the affidavit submitted by the police in support of the search-warrant application referenced a written statement that the police had obtained from Correia's roommate. Crowley's statement indicated that he was in the apartment when Correia came back at approximately four in the morning, took off his clothing, hid the walking cane he had been carrying underneath the entertainment center in the living room, and stated "I'm busted" when the police knocked on the apartment door. The police specifically requested that the magistrate allow them to seize not only the walking cane, but also the sweatpants and sweatshirt that defendant was believed to have been wearing when he reentered the apartment and before he doffed his clothing. The affidavit also indicated that these facts corroborated information obtained earlier from Mr. Peloquin regarding his having been bludgeoned with a cane.

We are satisfied that the facts and circumstances (and reasonable inferences to be drawn therefrom) evident within the four corners of these warrant-application materials provided the issuing magistrate with a substantial basis for concluding (relying upon a probability greater than mere suspicion) that criminal activity had taken place and "that contraband or evidence of a crime will be found in a particular place." *State v. Pratt,* 641 A.2d 732, 736 (R.I.1994) (quoting *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548); *State v. Baldoni,* 609 A.2d 219, 220 (R.I.1992) (probable cause requires less than prima facie showing of criminal activity); *State v. Kowal,* 423 A.2d 1380, 1383 (R.I.1980) (judicial officer may draw reasonable inferences from the affidavit); *State v. Joseph,* 114 R.I. 596, 603, 337 A.2d 523, 527 (1975) (probable cause must appear from the four corners of the application); *see also Marderosian v. United States,* 337 F.2d 759, 760 (1st Cir.1964) (probable cause requires more than mere suspicion).

### Conclusion

For these reasons we deny the defendant's appeal and affirm the judgments of conviction.

BOURCIER and GOLDBERG, JJ., did not participate.