June 13, 2018

**Supreme Court**

State        :      No. 2017-2-C.A.

               (P1/14-891AG)

v.          :

Ashner Alexis.      :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |  |
|---|---|---|
| State | : | No. 2017-2-C.A. |
|  |  | (P1/14-891AG) |
| v. | : |  |
| Ashner Alexis. | : |  |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  A senseless compulsion for revenge resulted in the tragic and unintended death of George Holland, Jr. and the conviction of four conspirators.  In the case under review, Ashner Alexis (Alexis or defendant) appeals from a judgment of conviction for murder (count 1); conspiracy to commit murder (count 2); and discharging a weapon while committing a crime of violence (count 3).  He was sentenced to two consecutive life terms of imprisonment on counts 1 and 3, and ten years to serve on count 2, also to be served consecutively.  He seeks to have his convictions reversed and the case remanded for a new trial, on the grounds that the trial justice abused his discretion in denying Alexis's motions to pass and in overruling Alexis's objections to photographic evidence, and because the trial justice erred in denying Alexis's motion for a new trial.  For the reasons set forth herein, we affirm the judgment of the Superior Court.[1]

**I**

**Facts and Procedural History**

In January 2014, Seydina Limamou Ndoye contacted Alain Bedame about purchasing a weapon for self-protection.  Bedame arranged a meeting with Johnathan and James Gomez so

---

[1] This matter was heard at Lincoln High School.

that Ndoye could purchase a gun from them. At the meeting, Ndoye gave Johnathan and James $240 for the purchase of a Glock handgun, which the Gomez brothers represented they would procure from their uncle. Bedame also allowed Johnathan to borrow his cell phone so Johnathan could contact his uncle. The Gomez brothers then left, cell phone and $240 in hand, never to return. After fifteen-to-twenty minutes passed, Ndoye and Bedame picked up some friends and drove to the Gomez residence on Colfax Street in Providence. Ebony Gomez, Johnathan and James's sister, told the group that her brothers were not at home. Ndoye told Ebony that he "wanted his stuff back." Ndoye and Bedame eventually located and confronted Johnathan, whom Bedame described as "shaking" and appearing as though he "was about to cry." Johnathan told Ndoye and Bedame that his uncle had robbed him of the cash and cell phone at gunpoint, but Johnathan promised that he would reimburse Ndoye and replace Bedame's cell phone.

Later, Ndoye showed Bedame a photograph posted on James Gomez's Facebook page, which, Ndoye believed, depicted James holding Bedame's cell phone. This initiated an exchange of hostile Facebook messages between Bedame and James Gomez. Thereafter, Alexis, having heard that Ndoye had been robbed by the Gomez brothers, contacted Ndoye on Facebook and told Ndoye that the Gomez brothers had also stolen scrap metal from Alexis's yard. Ndoye asked Alexis for a firearm; and, on February 4, 2014, Bedame, Alexis, and Ndoye drove to Woonsocket to "get the gun" from Alexis's friend.

When they arrived at the home of Alexis's friend, Anthony Moore,[2] they encountered twenty to twenty-five people having a party. Ndoye observed as Alexis informed Moore that he

---

[2] Anthony Moore was also charged and convicted of first-degree murder, conspiracy to commit murder, and using a firearm while committing a crime of violence for his involvement in the death of George Holland, Jr. *See State v. Moore*, 154 A.3d 472 (R.I. 2017).

wanted the gun because he had been robbed.  Alexis told Moore that he would return the gun.  Moore then directed Robert Winston to fetch a weapon.  Winston and Bedame left the house to obtain the gun.  Shortly thereafter, they returned and Winston placed a shotgun wrapped in a Cape Verdean flag and bullets with small pellets inside on the kitchen table.  According to Ndoye, Moore picked up the weapon and handed it to Alexis, who tucked it into his waistband, causing him to walk with a pronounced limp.  According to Ndoye, Alexis said that he would shoot "whoever comes to the door" at the Gomezes' home.

Winston, Ndoye, Bedame, and Alexis left Moore's house and headed to Providence.  According to Ndoye, they first stopped at the house of Alexis's girlfriend so that Alexis could change into dark clothes.  Bedame then drove to the Gomezes' home and parked a short distance away.  Alexis took a pair of work gloves and wore one glove himself, giving the other to Winston.  Alexis then put on a mask, removed the gun from the trunk of Bedame's car, "stuff[ed] the gun inside his waistband," and approached the Gomez house with Winston.  Alexis instructed Winston to knock on the Gomezes' window.  When Winston complied, a shadow appeared behind the closed blinds, and Alexis fired the shotgun, shattering the window.  Bedame and Ndoye heard the gunshot blast and then Alexis and Winston ran back to the car.  According to Ndoye, once Alexis and Winston were inside the vehicle, Alexis was laughing "hysterically" and exclaimed excitedly, "I got him" and "I pulled the trigger."  Bedame recalled Alexis stating that he "fe[lt] like shooting somebody else."

At this point, they left Bedame's vehicle in Providence, picked up Ndoye's car, and proceeded to Woonsocket to return the gun to Moore.  En route, Bedame received a Facebook message from James Gomez that stated, "They're coming for you, bro."  Hours later, Winston received a phone call from Moore, informing him that the wrong person had been shot.

In fact, the shadowy figure behind the blinds at the Gomezes's home was Ebony's boyfriend, seventeen-year-old George Holland, Jr. Miguel Gomez, the father of Johnathan, James, and Ebony, was watching television in a bedroom with his girlfriend on the evening of February 4, 2014, when he heard a loud bang, followed by a flash of light and the sound of his children screaming that Holland had been shot. Mr. Gomez ran into the living room and saw Holland, lying on the floor amid shell casings and glass, as Ebony held a sweater to his abdomen. Holland was transported to Rhode Island Hospital, where he was pronounced dead shortly after ten o'clock that evening as a result of nine individual shotgun pellet strikes to his right abdominal area.

During the police investigation, James Gomez showed Providence Police Detective Kenneth Court the Facebook postings made by Bedame. Detective Court then spoke with Bedame, which conversation led him to contact Ndoye. Both Bedame and Ndoye made statements implicating themselves, as well as Moore, Winston, and Alexis.

On March 28, 2014, Alexis was indicted along with Moore, Bedame, and Ndoye.[3] Alexis was charged with the murder of Holland (count 1); conspiracy to commit murder (count 2); and discharging a weapon while committing a crime of violence (count 3). A jury trial commenced on November 6, 2014. On November 17, 2014, Alexis was found guilty on all three counts. On January 8, 2015, the trial justice denied Alexis's motion for a new trial, and on February 12, 2015, he sentenced Alexis to two life sentences and ten years to serve, with each term to be served consecutively.

---

[3] Winston entered into a cooperation agreement with the state in exchange for his promise to testify truthfully at Alexis's trial. Bedame and Ndoye likewise entered into agreements with the state.

## II

## Issues on Appeal

Alexis argues that the trial justice abused his discretion in denying his motions to pass the case because an emotional outburst by a witness and Ndoye's reference during his testimony to a "mug shot" photograph of Alexis were extraordinarily prejudicial and because the instructions given were not sufficient to cure the prejudice. Alexis further contends that the trial justice abused his discretion in overruling his objection to the admission of a "gang" photograph. Alexis also argues that the cumulative effect doctrine should apply in this case. Lastly, Alexis argues that the trial justice erred in denying his motion for a new trial, arguing that the verdict was against the weight of the evidence. Alexis requests that his conviction be reversed, and that the case be remanded for a new trial.

## A

## Motions to Pass and Motions for Mistrial[4]

## 1

## Standard of Review

"It is well settled that 'a trial justice's decision on a motion to pass the case is addressed to the sound discretion of the trial justice, and this Court will not disturb the ruling on such a motion absent an abuse of discretion.'" *State v. Rosado*, 139 A.3d 419, 423 (R.I. 2016) (quoting *State v. Tully*, 110 A.3d 1181, 1190-91 (R.I. 2015)). "We give great deference to the trial justice in this regard because he or she has a front-row seat at the trial and is in the best position to determine whether a defendant has been unfairly prejudiced." *Id.* (quoting Tully, 110 A.3d at

---

[4] "A motion to pass a case is viewed for all intents and purposes as identical to a motion for a mistrial." *State v. Disla*, 874 A.2d 190, 198 (R.I. 2005) (quoting *State v. LaRoche*, 683 A.2d 989, 999 (R.I. 1996)).

1191). "When ruling on a motion to pass, the trial justice must assess the prejudicial impact of the statement in question on the jury and determine whether the evidence was of such a nature as to cause the jurors to become so inflamed that their attention was distracted from the issues submitted to them." *Id.* at 424 (quoting *State v. Cipriano*, 21 A.3d 408, 428 (R.I. 2011)). "[W]e previously have held that even prejudicial remarks do not necessarily require the granting of a motion to pass." *Id.* (quoting *Roma v. Moreira*, 126 A.3d 447, 449 (R.I. 2015)).

**a**

**Miguel Gomez's Emotional Outburst**

Alexis first argues that the trial justice abused his discretion in denying his motion for a mistrial because Mr. Gomez's emotional outburst on the witness stand prejudiced the jury against him. Moreover, he contends that the cautionary instruction given by the trial justice was insufficient to cure the prejudicial effect.

**i**

**Discussion**

Mr. Gomez was the first witness for the state. While on the witness stand, the prosecutor showed him a photograph of Holland and asked him if he knew the identity of the young man in the photograph. Mr. Gomez started crying and stated, "Yeah. It's George. He was like a son. He came all the time to the house." Defense counsel made a motion for a mistrial and the trial justice immediately called a recess. In the absence of the jury, defense counsel argued that Mr. Gomez's testimony did not provide any information that pertained to an essential element of any of the offenses and was not necessary to the state's case. Defense counsel further argued that the extremely emotional nature of the testimony prejudiced the jury against Alexis and that the testimony "irreparably tainted [the] jury and prejudiced the jury against" Alexis.

- 6 -

Although the trial justice acknowledged the emotional nature of Mr. Gomez's response, he denied the motion for a mistrial. The trial justice explained that "[s]urrounding his crying his responses were rather conversational, not fraught with emotion." The trial justice continued, "I'm not at all of a mind to believe that the witness's very short, although clear degree of upsetness, is something that is going to interfere with this jury's assigned work." He stated, "although the gentleman became upset, his degree of upset will not inflame the passions of jurors so as to prevent their calm and dispassionate examination of the evidence."

At the request of defense counsel, the trial justice gave a cautionary instruction when the jury returned to the courtroom. In giving the cautionary instruction, the trial justice stated:

> "All right. Folks, thank you for giving us a few minutes to take up some matters outside your presence.
> "Mr. Gomez, obviously, as you know, became upset when he was speaking about the death of George Holland. Cases such as these, obviously, will engender some emotion. Sometimes even spectators—it [h]asn't happened yet, but sometimes even spectators in the courtroom become unglued, if I can use the vernacular. In those instances, we take a recess and let things calm down.
> "And I simply want to remind you, as I said before the trial started, that there would be instances, for example, during the medical examiner's testimony or during photographic evidence, that would not be particularly pleasant, and I didn't want you to be distracted from your assigned responsibility simply because of things that you heard on the stand or pictures that you saw.
> "I also reminded you at the beginning that—if I didn't, I certainly will emphasize it now, and probably later, and I think the lawyers referred to it during their comments to you—sympathy plays no part in the course of your deliberations. Obviously, Mr. Gomez was upset to the extent that he may have engendered some sympathy from you. Understand that notwithstanding his sad feelings over the loss of the young man, that cannot be permitted to affect your judgment as you go forward in this case and as you deliberate.
> "In other words, you must not permit these kinds of events, be they photographic pieces of evidence of an autopsy, or testimony from someone who is near and dear to the deceased, or things like that, you can't permit those things to inflame your

passions so as to prevent your calm and dispassionate examination of the evidence and acceptance of the law that I will provide to you at the end of the case.

"Can all of you do that?"

The trial justice then questioned the jury, "Are there any of you at all who have been so affected by Mr. Gomez's short interlude of sadness and crying on the stand that they cannot go forward? Anybody feel that way? Everybody okay?"

Alexis argues that the cautionary instruction was insufficient to cure the prejudice because the trial justice "did not direct the jurors to disregard the prejudicial emotional outburst, and he did not emphasize that this behavior did not relate to the guilt or innocence of Mr. Alexis." Alexis further argues that the trial justice "failed to direct the jurors to not consider this emotional outburst, or to put the outburst out of their minds."

We afford the trial justice a great deal of discretion in determining whether or not a witness's emotional reaction inordinately inflamed the passions of the jury. *See Rosado*, 139 A.3d at 424. The trial justice is in the best position to determine whether or not the emotional outburst would distract the jury from its function. *Id.* at 423-24. Here, the trial justice considered the potential impact of the witness's emotional display and determined that, despite the outburst, the jurors would be able to continue in their duties calmly and dispassionately.

"[T]here is no 'precise formula' to determine whether any prejudicial taint may have been cured by a cautionary instruction." *State v. Hie*, 93 A.3d 963, 973 (R.I. 2014) (quoting *State v. Oliviera*, 882 A.2d 1097, 1127 (R.I. 2005)). Instead, "[e]ach case must be decided on an *ad hoc* basis and each challenged remark must be viewed in the context in which it appeared and in light of the attendant circumstances." *Id.* (quoting *State v. Hoyle*, 122 R.I. 45, 48, 404 A.2d 69, 70-71 (1979)). Where "the trial justice decide[s] to 'utilize a cautionary instruction[,]' * * * 'the question before us is whether [the trial justice's] instruction can be fairly said to have removed

- 8 -

from [the jurors' minds], when weighing the evidence properly before them, the taint represented' * * *." *Id.* (quoting *State v. Brown*, 528 A.2d 1098, 1103 (R.I. 1987)).

We are well satisfied that Mr. Gomez's relatively short display of emotion on the witness stand did not warrant a mistrial and that the trial justice did not abuse his discretion in denying Alexis's motion. Moreover, we are of the opinion that the cautionary instruction given by the trial justice was sufficient to remove any possible taint caused by Mr. Gomez's outburst from the minds of the jury. The defendant points to *State v. Massey*, 119 R.I. 666, 382 A.2d 801 (1978), for the proposition that a trial justice must inform the jury that they are not to consider the improper statement or outburst. The circumstances of this case, however, are distinguishable from *Massey*, where evidence of a prospective juror's opinion that a defendant had committed the crime was heard by the entire prospective jury panel. *Massey*, 119 R.I. at 669-70, 382 A.2d at 803. Here, Mr. Gomez's emotional response did not implicate Alexis in the crime. Further, while the trial justice did not specifically tell the jury to disregard the emotional display, he explained to the jury that "sympathy plays no part in the course of [their] deliberations" and that they were not to become "distracted from [their] assigned responsibility" or let the outburst "affect [their] judgment." Finally, he twice asked the jurors whether they could put Mr. Gomez's sadness and crying aside during their deliberations, to which the jurors collectively responded in the affirmative.

In our judgment, after a review of the record, considering the context in which Mr. Gomez's emotional response was elicited, and the trial justice's curative instruction, there is no reason to believe that the jury in the instant case was not able to make an objective evaluation of the evidence against Alexis. The trial justice, therefore, did not abuse his discretion in denying the motion for a mistrial.

**b**

**Ndoye's Reference to Mug Shot Photograph**

Alexis next argues that the trial justice abused his discretion in failing to pass the case because Ndoye's characterization of a photo of Alexis as a mug shot by Ndoye was extraordinarily prejudicial and the cautionary instruction was insufficient to cure the prejudice.

**i**

**Discussion**

At trial, upon being asked if he recognized a photograph, Ndoye stated, "It's a mugshot of Ashner Alexis." Defense counsel objected, the objection was sustained, and then defense counsel moved to strike the testimony. The trial justice ruled, "It is stricken, of course." Defense counsel then moved at sidebar to pass the case and requested, in the alternative, a cautionary instruction. Though the trial justice agreed that the photograph was not necessary to the state's case, he denied the motion to pass. The trial justice noted that the photograph was "clearly a photograph of the processing of [] defendant," but indicated that "[t]he [s]tate is very fortunate in this instance that [] defendant is in custody * * * [and] that the jury knows he's in custody" because "all people who are detained in custody have a photograph taken."

The trial justice gave a cautionary instruction, which stated:

> "Ladies and gentlemen, you've heard me sustain [defense counsel's] objection to this witness's gratuitous, editorial comment that the photograph that he was shown was somehow or another a mugshot.
> "It is not a mugshot. Simply because the police department has a photograph of the defendant doesn't mean that he committed this or any other crime. The police collect pictures of many people from many sources and for many different purposes.
> "How many of you have a driver's license? Every single one of you. The DMV has a picture of every single one of you. And for a dollar and fifty cents, whatever the going rate is these

days, you can get a copy. If the police wanted a picture of you, they have it at their fingertips.

"The photograph shall not be admitted into evidence. The witness's gratuitous comment as to how he describes it is erroneous. It's not what he [said] it is, and let's move on."

Alexis argues that the instruction was inadequate to cure the prejudice because the trial justice "did not direct the jurors to disregard the mugshot characterization, and he did not emphasize that this gratuitous comment did not relate to the guilt or innocence of Mr. Alexis." Alexis further argues that the trial justice "failed to direct the jurors to not consider this comment, or to put the comment out of their minds. Instead, [the trial justice] said that the photograph was not a mugshot."

Here, the trial justice instructed the jurors that the term "mug shot" was inaccurate and was not indicative of any criminal activity on the part of defendant. This Court has expressed that "the introduction of mug-shot photographs clearly has the potential of unfairly tipping the scales of justice in favor of one party or the other[,]" *Thomas v. Proctor*, 63 A.3d 881, 887 (R.I. 2013), because "they generally indicate past criminal behavior and are likely to create in the minds of jurors an inference of criminal behavior." *State v. Dinagen*, 639 A.2d 1353, 1356 (R.I. 1994). However, a cautionary instruction can be curative of prejudice. *See State v. Werner*, 831 A.2d 183, 207 (R.I. 2003) (determining that a cautionary instruction that expresses that the term "mug shot" does not "connote anything with regard to [the] defendant's guilt or his participation in the crime or any other crime" was sufficient). We conclude that, although the photograph at issue was described as a mug shot in front of the jury, the witness's statement was stricken, the photograph was not placed into evidence, and the jury was told that the photograph was not a mug shot and that the photograph was not indicative of defendant's guilt in this or any other

crime. We are satisfied that this instruction was sufficient to cure any prejudice and that the trial justice did not abuse his discretion.

## B

### Admissibility of Photograph

Alexis next argues that the trial justice abused his discretion in admitting a photograph depicting Moore, Alexis, Winston, and others at Moore's house party on February 4, 2014, because "[t]he probative value of the photograph was substantially outweighed by the prejudicial effect * * *."

## 1

### Standard of Review

Rule 403 of the Rhode Island Rules of Evidence provides that, even if evidence is considered relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "It is well settled that this Court will not disturb a trial justice's ruling on an evidentiary issue unless that ruling constitutes an abuse of the justice's discretion that prejudices the complaining party." *State v. Tetreault*, 31 A.3d 777, 782 (R.I. 2011) (quoting *State v. Dellay*, 687 A.2d 435, 439 (R.I. 1996)). This Court has indicated "that a trial justice's discretion to exclude evidence under Rule 403 must be used sparingly[,]" and "[i]t is only when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it." *State v. DeJesus*, 947 A.2d 873, 883 (R.I. 2008).

**2**

**Discussion**

Winston testified that the photograph at issue was taken at Moore's house and explained that the photograph depicted himself, Alexis, Moore, and other individuals at the party; but the photograph did not display Ndoye or Bedame. Later at trial, defense counsel objected to the admission of the photograph as a full exhibit, arguing that the photograph was unduly prejudicial because the individuals were making hand gestures or signs that appeared to be gang-related. Defense counsel also argued that the photograph was irrelevant because it was uncontested that Alexis was at Moore's party. The state argued that the photograph was relevant as it bore directly on the credibility of the witnesses, and that it was not unduly prejudicial because the word "gang" had not been used throughout the trial. The trial justice overruled the objection, finding the photograph to be "relevant for purposes of showing the concert of action, concert of activity, corroboration of testimony[,]" and "credibility * * * of witnesses who have testified." The trial justice also found that the evidence was not unduly prejudicial because there was no evidentiary basis to support an inference of gang activity. The trial justice also gave a cautionary instruction to the jury, which provided:

> "That picture that portrays some young men, ladies and gentlemen, you've heard some testimony about them, a group of some sort, and I simply want to caution you that simply because a person may be a member of or affiliated with a group is in no way to be considered as evidence that the person is somehow necessarily disposed to commit a crime or crimes."

Alexis argues before this Court that the photograph was "enormously prejudicial to Mr. Alexis because all of the young men in that photograph looked like a bunch of thugs who should be locked up forever * * *." Alexis asserts that "[n]obody was contesting that Mr. Alexis, Mr. Winston or Mr. Moore were at that party and this was not an issue at trial." Alexis also argues

- 13 -

that the trial justice's cautionary instruction was insufficient to cure the prejudice of the photograph because "the photographs [were] obviously gang pictures and extremely prejudicial to Mr. Alexis."

Based on the record, this photograph appears highly probative of defendant's guilt because it was taken the evening of Holland's death; shows Alexis with two individuals who, according to the state's theory of the case, were involved in the murder of Holland; and was taken at the location where the murder weapon was said to have been procured. *See DeJesus*, 947 A.2d at 883 ("It is only when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it.").

We agree with the trial justice here that there is no evidentiary basis to support an inference of gang activity based on the photograph alone. *See Delarosa*, 59 A.3d at 1188 (stating that it is within the sound discretion of the trial justice to admit or exclude photographic evidence). However, even if this photograph may have raised a question in the minds of the jurors regarding Alexis's affiliation with a gang, the trial justice's cautionary instruction sufficiently directed the jury not to infer criminal activity on the part of Alexis based on his affiliation with the individuals in the photograph. Therefore, the trial justice did not abuse his discretion in admitting the photograph.

## C

### Cumulative Effect Doctrine

Alexis also argues that "the cumulative effect of all of the errors and abuses of discretion in this case resulted in the denial * * * of a fundamentally fair trial." Because we have concluded that none of the rulings complained of constituted an abuse of discretion, this claim is

- 14 -

without merit. *See State v. Ashness*, 461 A.2d 659, 672 (R.I. 1983) (determining that "several rulings that individually are not erroneous cannot cumulatively constitute prejudicial error").

## D

## Motion for a New Trial

Lastly, Alexis argues that the trial justice erred in denying his motion for a new trial because the verdict was against the weight of the evidence. Alexis asserts that the evidence against him was based entirely on the credibility of the state's witnesses and avers that these witnesses were not credible because they had been "bought and paid for" by the state, had time to confer with one another, "gave self-serving testimony, lied, contradicted each other and themselves, and tried to deflect responsibility from themselves to [Alexis] * * *." Specifically, Alexis argues that Ndoye's testimony was incredible because he "deleted all of his Facebook conversations before he went to talk with the Providence Police * * *." Alexis also maintains that Bedame's testimony was not credible because he lied "about not being mad at the Gomez brothers" when "his Facebook records indicated he was furious and wanted the Gomez brothers dead." Finally, Alexis avers that Winston's testimony was incredible because he "lied to the police about nearly everything * * *." Moreover, Alexis argues that he had no motive to become involved in a confrontation that was strictly between the Gomez brothers, Ndoye, and Bedame. Alexis theorizes that Ndoye and Bedame lied on the stand "because they were afraid of Johnathan Gomez * * *."

## 1

## Standard of Review

"On a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, 'the trial justice places himself or herself in the role of a thirteenth juror and then

- 15 -

exercises his or her independent judgment as to the credibility of the witnesses and the weight of the evidence.'" *State v. Adams*, 161 A.3d 1182, 1200 (R.I. 2017) (quoting *State v. Grantley*, 149 A.3d 124, 131 (R.I. 2016)). "[T]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *Id.* (quoting *Grantley*, 149 A.3d at 131).

"If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Adams*, 161 A.3d at 1200 (quoting *State v. Clay*, 79 A.3d 832, 842 (R.I. 2013)). "Only when the trial justice does not agree with the jury's verdict, [must he or she] embark on a fourth analytical step." *Id.* (quoting *Clay*, 79 A.3d at 842). "The fourth step of the analysis requires the trial justice to 'determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted.'" *Id.* (quoting *State v. Guerra*, 12 A.3d 759, 765-66 (R.I. 2011)).

"When reviewing a trial justice's decision on a motion for a new trial, [w]e accord great deference * * * because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Adams*, 161 A.3d at 1200 (quoting *Grantley*, 149 A.3d at 131). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *Id.* at 1200-01 (quoting *Grantley*, 149 A.3d at 131).

## 2

### Discussion

Here, the trial justice considered Alexis's arguments in support of his motion for a new trial, agreed that "there were discrepancies and/or inconsistencies in Winston's testimony," and was "mindful that he testified under a cooperation agreement," but determined that "the essence of [the state's witnesses'] testimony was credible and reliable." A review of the record indicates that much of the witnesses' testimony was consistent. Winston, Ndoye, and Bedame all testified about Alexis's boastful conduct in the vehicle after the shooting. Additionally, Bedame and Ndoye testified that they went with Alexis to Moore's house to purchase a gun. Moreover, several witnesses testified that Moore instructed Alexis to harm Winston if he did not do as he was told.

A mere disagreement with the trial justice's credibility determination is an insufficient basis for reversal. The trial justice "has [had] the opportunity to observe the witnesses as they testify and therefore is in a better position to weigh the evidence and to pass upon the credibility of the witnesses than is this [C]ourt." *State v. Harrison*, 66 A.3d 432, 446 (R.I. 2013) (quoting *State v. Rivera*, 987 A.2d 887, 903 (R.I. 2010)). We perceive no basis in the record before us to question the adequacy of the trial justice's credibility determinations or that would cause us to believe that he overlooked or misconceived material evidence or was otherwise clearly wrong.

### III

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.

- 17 -

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Ashner Alexis. |
| **Case Number** | No. 2017-2-C.A. (P1/14-891AG) |
| **Date Opinion Filed** | June 13, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State: Jane M. McSoley Department of Attorney General |
| | For Defendant: Jodi M. Gladstone, Esq. |