March 26, 2021

**Supreme Court**

No. 2019-106-C.A.
(P1/13-3393A)

State                          :

    v.                         :

Antonio Acosta.                :


NOTICE:   This opinion is subject to formal revision
before publication in the Rhode Island Reporter.  Readers
are requested to notify the Opinion Analyst, Supreme
Court of Rhode Island, 250 Benefit Street, Providence,
Rhode Island 02903, at Telephone (401) 222-3258 or
Email opinionanalyst@courts.ri.gov, of any typographical
or other formal errors in order that corrections may be
made before the opinion is published.

State                              :

v.                               :

Antonio Acosta.                     :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Antonio Acosta, appeals

following the September 21, 2015 judgment of conviction and commitment entered

against him for one count of first-degree sexual assault and three counts of second-

degree child molestation following a jury trial in Providence County Superior Court.

He contends on appeal that the trial justice clearly erred in denying his motion for a

new trial because he overlooked and misconstrued material evidence such as the

victim's motive to lie, the implausibility of the victim's claims, and the "complete

absence of any independent evidence to support these accusations."

This case came before the Supreme Court pursuant to an order directing the

parties to appear and show cause why the issues raised in this case should not be

summarily decided. After a close review of the record and careful consideration of the parties' arguments, we are satisfied that cause has not been shown and that this case may be decided at this time.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

In 2013, Mr. Acosta was charged by indictment with one count of first-degree sexual assault in violation of G.L. 1956 §§ 11-37-2 and 11-37-3 for "digital vaginal penetration, by force or coercion" of the victim, Ivy,[1] between June 1, 2012 and September 30, 2012 (Count One). He was also charged by the same indictment with three counts of second-degree child molestation in violation of §§ 11-37-8.3 and 11-37-8.4 for the following alleged conduct: hand-to-breast sexual contact with a person fourteen years of age or under between October 16, 2009 and January 3, 2010 (Count Two); hand-to-vagina sexual contact with a person fourteen years of age or under between October 16, 2009 and January 3, 2010 (Count Three); and hand-to-

---

[1]     We note that, at the time of trial, the victim identified as male and went by a name which was different from the victim's birth name; but the victim agreed, for the purposes of the trial, to be referred to by female pronouns and to be called by her birth name. Accordingly, in this opinion, we will refer to the victim with a female pseudonym, and we will use female pronouns. In so doing, we intend no disrespect.

breast sexual contact with a person fourteen years of age or under between June 1, 2011 and September 30, 2011 (Count Four).

A trial ensued over several days in May of 2015.  We relate below the salient aspects of what transpired at that trial.

## A

### The Testimony of Ivy

The complainant, Ivy, testified that defendant was the boyfriend of her grandmother, Mildred Silvestre.  She added that she had known him all of her life and that she considered him to be like a grandfather.  She testified that she spent summer vacations and weekends with Ms. Silvestre, and she described her relationship with Mr. Acosta as "good."  It was her testimony that that relationship changed when she turned eleven.  She stated that, on the night of her eleventh birthday party in 2008, defendant positioned her on his lap so that she was facing him and that, when she put her head on his shoulder, "he started grinding his penis against [her] pelvis area" for a couple of seconds; she added the following: "I think he heard my grandma coming so he stopped."[2]  It was her testimony that her

---

[2]    The trial justice cautioned the jury that the testimony with respect to the incident on the day of Ivy's eleventh birthday party could only be considered for a limited purpose because that incident did not form the basis of any of the charges in the case.  He stated that it could not be used to find that Mr. Acosta was a person of bad character or that he had a criminal propensity.  Rather, he stated that it was admitted only for the purpose of "deciding whether the defendant had the

grandmother and her grandmother's sisters were in the kitchen while she and defendant were in the dining room.

Ivy then testified about an incident which she stated had occurred at defendant's home when she was twelve years old. It was her testimony that, while defendant and others (including Ivy's grandmother) were playing dominos in the next room, she was watching television on defendant's bed. She testified that defendant came into the bedroom and showed her his band instruments. It was her testimony that he then kissed her on the lips, pushed her onto the bed, tried to kiss her again, and touched her breasts and vagina over and under her clothes. She added that she told him to stop and tried to push him away from her and he replied, "'[J]ust let me.'" She further testified that she was embarrassed and that she did not want her grandmother to find out because her grandmother was suffering from mental health issues. She also testified that, while this incident was occurring, a woman she referred to as her aunt walked into the bedroom. She added that defendant then "acted like he was reaching for something over the bed, over me and he got up." She testified that her aunt "just stared" for "a couple of seconds" and then left. She stated that she did not say anything to her aunt because she did not want her aunt to tell her grandmother.

---

opportunity, and disposition towards this witness to sexually assault her on the dates alleged in the indictment."

It was Ivy's testimony that the next incident occurred in 2011, when she was thirteen years old. She testified that she was using the computer in her grandmother's bedroom while her grandmother and her siblings were outside in the pool in the backyard. She stated that defendant came into the room, put his hands under her shirt, and rubbed her breast for "[t]hree seconds, maybe." She stated that she told him to stop and he said, "[J]ust let me." It was her testimony that he stopped when she heard her grandmother coming up the stairs. She added that, after her grandmother left the room, defendant gave her about thirty dollars.

According to Ivy's testimony, the third incident occurred in the Summer of 2012 when she was fourteen years of age. She testified that she was shopping at the Emerald Square Mall with her grandmother and defendant. She further stated that, upon returning from the mall to her grandmother's home, defendant took her out driving when her grandmother would not do so. She stated that, while she was driving, he put his hands on her thighs and that, when they were parked in a parking lot, he rubbed her thigh and "quickly" put his hands under her pants and his fingers in her vagina. She said it lasted for three or four seconds and that she tried to remove his hands and threatened to call her grandmother. She stated that he ultimately stopped when a stranger walked up and got into a van parked next to them. She acknowledged that she told the police that she was wearing shorts during this

incident but that, at the time of trial, she remembered that she was wearing "black loose pants."

According to Ivy's testimony, when she was fifteen years old she told her counselor at her high school what had happened to her. She stated at trial that the reason she told her counselor what had happened to her was that her grandmother had had "a little get together" and defendant was there; she added that, as a result of that encounter, she "kind of got freaked out * * *." It was her testimony that she later spoke to someone from the Department of Children, Youth & Families and that she also gave a statement to the police. She further testified that defendant had never punished her, "told on [her] for anything that [she had] done," or done "anything bad" to her about which she might have been angry (other than the incidents about which she had just testified).

Ivy was cross-examined at length on her relationship with her family members, the effect of her sexuality on her relationship with her family members, her behavioral issues, and whether she was angry with defendant for disclosing personal information about her when she had asked him not to do so. She was also questioned at length about inconsistencies between the statement she gave to the police, her testimony before the grand jury, and her testimony at trial.

Ivy acknowledged during cross-examination that she had told defendant that she was gay, although she gave conflicting testimony as to whether or not she asked

him not to disclose that information. However, she testified that she never told defendant that he was "going to pay for disclosing [her] secret;" she added that she told her family herself that she was gay. She also acknowledged on cross-examination that she did return to her grandmother's house after disclosing the abuse which she had allegedly suffered, even though she knew that defendant "frequent[ed]" the home. On redirect examination, she testified that she had told her grandmother she was gay before she told defendant.

**B**

**The Testimony of Mr. Acosta**

The defendant testified through an interpreter that, in December of 2012, he saw Ivy at a family gathering at her grandmother's home. He added that, at that gathering, she told him in a low voice: "[Y]ou are going to pay for what you said." He stated that he did not "pay attention" and thought of it as "a kid's thing" because he had not "done anything." It was his testimony that it was two weeks later that he learned that the police were looking for him. He then testified that, with respect to what Ivy had been referring to in her statement to him at the December 2012 gathering, about three months earlier she had told him that she was "[t]ranssexual" and "gay" and she told him not to tell her grandmother. He added that she told him that it was a "secret * * *."

The defendant further stated that the incident which purportedly occurred when Ivy was on his lap was "not true." With respect to the first charged incident, which allegedly occurred at his home, he denied that it occurred; and he added that he "didn't have time for that. I was taking care of my people and the doors were all open." When asked about the second charged incident when Ivy was on the computer at her grandmother's home, he denied that the incident occurred and stated that he would "never do something like that." He added: "I have granddaughters that are her age. I would never want -- I have respect for them, I would never want anyone to abuse them." With respect to the third charged incident which allegedly occurred when he had taken Ivy driving, it was his testimony that Ivy's accusation was not true. He added that, contrary to Ivy's testimony, a friend of Ivy's had accompanied them to the mall.

On redirect examination, he stated that he thought that Ivy's comment at the holiday gathering was due to the fact that she had asked him not to say anything about what she had told him about her sexuality and gender identity and "she knew that her grandmother already knew and I think that she thought that I had * * * [told her grandmother] [t]hat she was gay."

## C

### The Testimony of Mildred Silvestre

Ms. Silvestre testified through an interpreter. She stated that she had been romantically involved with defendant from 1995 to 1998 and that they remained friends. Her testimony varied from Ivy's with respect to some details—as illustrated by her testimony that Ivy only spent weekends at her home, but did not spend summers there. She also testified, with respect to the first charged incident, that Ivy was at defendant's apartment only once and that defendant called Ms. Silvestre after that visit to report that Ivy had "change[d] all the drawers" and hid his jewelry.[3] She further stated, with respect to Ivy's testimony about the second charged incident, that she did not have a pool but that children had played in a "kiddy pool" at her house. She also denied having any memory of a time when Ivy was on the computer upstairs at her home while defendant was with her. It was also her testimony, with respect to the third charged incident, that a friend of Ivy's had gone to the Emerald Square Mall with them and that, on the way home, Ivy asked defendant to take her driving. She stated that she learned that Ivy was "gay or transgender" from Ivy's mother.

---

[3]    In contrast, Ivy testified that, on the day in question, she did not do anything with respect to the drawers in defendant's bedroom.

## D

## The Verdict, the Motion for a New Trial, and Sentencing

During deliberations the jury sent the court a question asking why Ivy's aunt did not receive a subpoena. The trial justice responded by telling the jury that it was obliged to decide the case based on the evidence presented; he added that the jury "should not speculate as to why something was not commented upon or presented to you." The jury then posed a second question about Ms. Silvestre's testimony, with which question the trial justice "struggled" because he was "not sure what [the jury was] seeking." The trial justice advised the jury that it could not hear additional testimony, but the trial justice stated that the jury could have portions of the trial testimony read back upon request. The jury then requested to have certain portions of Ms. Silvestre's testimony read back.

Ultimately, the jury returned a verdict of guilty on all four counts. The defendant filed a timely motion for a new trial. On June 8, 2015, a hearing was held on defendant's motion. At the close of that hearing, the trial justice delivered a bench decision denying the motion for a new trial.[4]

On September 11, 2015, defendant was sentenced to serve fifteen years at the Adult Correctional Institutions on all four counts, to run concurrently, and he was

---

[4] For a more detailed discussion of the trial justice's decision denying the motion for a new trial, *see infra*.

ordered to register as a sex offender.[5]  The defendant filed a timely appeal to this Court.

## II

## Standard of Review

When we review the decision of a trial justice on a motion for a new trial, "[w]e accord great deference * * * because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses."  *State v. Alexis*, 185 A.3d 526, 537 (R.I. 2018) (quoting *State v. Adams*, 161 A.3d 1182, 1200 (R.I. 2017)).  "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong."  *State v. Grantley*, 149 A.3d 124, 131 (R.I. 2016) (quoting *State v. Florez*, 138 A.3d 789, 793 (R.I. 2016)).

## III

## Analysis

On appeal, defendant contends that the trial justice erred in denying his motion for a new trial because the weight of the evidence did not support the verdict.

---

[5]  The judgment of conviction and commitment was entered on the electronic docket on September 11, 2015, but it was not signed by the clerk and the trial justice until September 21, 2015.

Specifically, he avers that the trial justice overlooked and misconstrued material evidence when he "overlooked [Ivy's] motive to lie—her anger over his having violated her confidence—as well as evidence that showed that her poor relationship with Mr. Acosta started only after" he violated her confidence. The defendant further posits that the trial justice erred in failing to consider the implausibility of Ivy's claims and the "complete absence of any independent evidence to support these accusations."

"[W]hen a trial justice is presented with a motion for a new trial based on the weight of the evidence, he or she acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Gumkowski*, 223 A.3d 321, 328 (R.I. 2020) (quoting *State v. Johnson*, 199 A.3d 1046, 1050-51 (R.I. 2019)). The trial justice must conduct a multi-step "analytical process when passing upon a motion for a new trial." *State v. DiCarlo*, 987 A.2d 867, 870 (R.I. 2010). "The trial justice must consider the evidence in light of the jury charge, then independently assess the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached a result different from that reached by the jury." *Gumkowski*, 223 A.3d at 328 (quoting *Johnson*, 199 A.3d at 1051). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable

minds could differ as to the outcome, the motion for a new trial should be denied." *Id.* (quoting *Johnson*, 199 A.3d at 1051).

Additionally, "we have indicated that the 'record should reflect a few sentences of the justice's reasoning on each point.'" *DiCarlo*, 987 A.2d at 870 (quoting *State v. Banach*, 648 A.2d 1363, 1367 (R.I. 1994)). "In providing his or her rationale, the trial justice is not required to 'refer to *all* the evidence supporting the decision; rather, he or she need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards.'" *State v. Greenslit*, 135 A.3d 1192, 1198 (R.I. 2016) (emphasis in original) (quoting *State v. Robat*, 49 A.3d 58, 71 (R.I. 2012)).

The trial justice in this case properly applied the analysis that must be carried out in dealing with a motion for a new trial, and he provided a thorough discussion of his reasoning at each step. He began his decision by reviewing the evidence provided in the case, and he specifically mentioned the nature of the sexual assault charges before the jury. *See Gumkowski*, 223 A.3d at 328.

He then began independently assessing the credibility of the witnesses and the weight of the evidence. *See id.* He stated that he had considered the testimony of all three witnesses. Then he went on to note that "any fact finder be it the judge or a jury, from weighing and sifting and deciding whether this testimony can be accepted or rejected is certainly I think going to consider th[e] circumstances, age,

appearance and demeanor and those things going on in this young person's life * * *." The trial justice stated that there was "no question that [Ivy] was thoroughly and vigorously cross-examined," and he stated that he was not overlooking that cross-examination; he specifically mentioned the inconsistent reports given by Ivy to the police and the grand jury. He further mentioned Ivy's manifesting what he described as signs of "displeasure, frustration, sort of really didn't want to be here at the time, attitude" during cross-examination. Then he stated as follows:

> "[T]his is a case of sexual assault and child molestation of a person between the age of 11 and 14 who was molested as a female, who now has a male gender identification, who is struggling through the estrangement with family members she [formerly] had a great relationship with, in light of that and considering that, this Court believes that the detail with respect to the various incidences [*sic*] was sufficient and the Court finds her testimony to be reasonably and sufficiently credible in light of her age under these unique circumstances * * *."

After conducting his independent assessment of the credibility of the witnesses and the weight of the evidence, the trial justice went on to state that, in his opinion, "reasonable minds could differ as to what the verdict should be * * *." For that reason, he denied defendant's motion for a new trial. *See Gumkowski*, 223 A.3d at 328.

After careful consideration, we are unable to perceive reversible error in the trial justice's analysis of the motion for a new trial or in his conclusion that the

motion should be denied; this was a close and troubling case which rested entirely upon the credibility of Ivy and defendant, but we can discern no reversible error on the part of the conscientious trial justice.

The defendant takes issue with the following statement by the trial justice with respect to Ivy's motive to lie: "There was an exploration of no apparent motive in this case. She seemed to get along with everybody until these events started to unfold. So certainly no motive to be considered with respect to her testimony." However, it is clear from the record that the trial justice went on to state that Ivy's "struggles with her gender identity issue and lack of acceptance of that by family members including her grandmother" were explored at trial and may potentially have constituted a reason to testify as she did; he further mentioned the fact that, according to defendant, Ivy had invited him to her fifteenth birthday party as an issue to be considered when addressing her reliability and trustworthiness. In summary, this Court does not perceive any reversible error on the part of the trial justice; he certainly did not, as defendant contends, overlook the evidence of Ivy's potential motive for testifying as she did or the evidence that her poor relationship with Mr. Acosta started only after he allegedly violated her confidence.

The defendant further contends that the trial justice overlooked the lack of independent evidence in the case. In this respect, we would simply note that there is no requirement of independent corroboration for sex offense cases. *See*

§ 11-37-11; *State v. Rathbun*, 184 A.3d 211, 218 (R.I. 2018) ("This Court has explicitly eliminated any requirement of independent corroboration for sex-offense cases because the corroboration requirement arbitrarily singles out victims of sex offenses as a class whose credibility is immediately suspect; [b]y its adoption of [§] 11-37-11, the General Assembly has rejected this concept as a discredited anachronism * * *.") (internal quotation marks omitted).

For these reasons, this Court is satisfied that the trial justice in this case properly carried out the detailed analysis that must be carried out when passing upon a motion for a new trial and supportably concluded that the motion should be denied. We are further of the opinion that the trial justice did not overlook or misconceive material evidence in this case and did not commit any clear error. *See Grantley*, 149 A.3d at 131. Accordingly, giving great deference to the decision of the trial justice on the defendant's motion for a new trial, we affirm that decision. *See id.*

## IV

## Conclusion

Accordingly, we affirm the judgment of the Superior Court. We remand the record to that tribunal.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Antonio Acosta. |
| **Case Number** | SU-2019-106-C.A. (P1/13-3393A) |
| **Date Opinion Filed** | March 26, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State: <br><br> Mariana E. Ormonde <br> Department of Attorney General <br> For Defendant: <br><br> Kara J. Maguire <br> Office of the Public Defender |